## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HENRY KAUL** | **CIVIL ACTION** |
| **VERSUS** | **NO: 13-0093-LMA-SS** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Henry P. Kaul, III ("Kaul"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for disability insurance benefits and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423 and 1382.

## PROCEDURAL HISTORY

On October 22, 2010, Kaul submitted applications for benefits. R. 132-146. He alleged that he became unable to work on November 30, 2009, because of severe diabetes, hepatitis C, post traumatic stress syndrome, a problem with the rotator cuff in his right shoulder and depression. R. 132 and 175. The applications were denied. R. 62 and 75. On September 28, 2011, there was a hearing before an Administrative Law Judge ("ALJ"). R. 32. On October 20, 2011, the ALJ issued an unfavorable decision. R. 13-25. On November 26, 2012, the Appeals Council denied the request for review. R. 4-9. On January 17, 2013, Kaul filed a complaint in federal court. Rec. doc. 1. The parties submitted cross-motions for summary judgment. Rec. docs. 15 and 17.

## STATEMENT OF ISSUE ON APPEAL

**Issue.**  Whether substantial evidence and relevant legal standards support the ALJ's determination that Kaul's mental impairment was not severe at step two of the sequential evaluation process?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following findings relevant on appeal:

1.  Kaul met the insured status requirements of the Act through June 30, 2010.

2.  Kaul has not engaged in substantial gainful activity since November 30, 2009, the alleged onset date (20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).

3.  Kaul has the following medically determinable impairments:  diabetes mellitus and hypertension (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.  Kaul does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  Kaul has the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. §§ 1567(c) and 416.967(c).

6.  Kaul is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7.  Kaul was born in 1959 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8.  Kaul has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not Kaul has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering Kaul's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Kaul can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.    Kaul has not been under a disability, as defined in the Act, from November 30, 2009, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

R. 15-25.

## ANALYSIS

a.    **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the

Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

if the Commissioner finds at any step that the claimant is or is not disabled.  <u>Leggett v. Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  <u>Id</u>.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  <u>Greenspan</u>, 38 F.3d at 236; <u>Kraemer v. Sullivan</u>, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  <u>Id</u>.; accord <u>Selders</u>, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  <u>Perez</u>, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  <u>Martinez v. Chater</u>, 64 F.3d 172, 174 (5th Cir. 1995).

b.  **Testimony at the Hearing**.

At the time of the hearing, Kaul was 52.  R. 35.  He had received a GED.  R. 35.  His problems began after he was hospitalized in 2009 for a seizure and a coma.  R. 38.  He could not recall dates.  He needed an operation on his eyes.  R. 35.  He had diabetes.  R. 36.

Kaul's last employment was at the Superdome in 2010 for 4 hours as a crane inspector (mechanic) and stage hand.  R. 35-36.  When he tried to work, he could not remember the order in which tasks were to be performed.  R. 37.  He was late for work because he forgot where he was told to be.  R. 37.  He was unable to perform work that he had done previously and done well.  R. 38.  He was unable to do simple mechanical tasks around the home like hook up an exhaust hose for a

dryer. R. 38. He needed transportation but was unable to do simple things to maintain a motorbike. R. 39. He had trouble making decisions. It took it him several months to figure out that he was entitled to a discount at the pharmacy. R. 39.

Kaul was depressed. R. 40. His energy levels were down. R. 42. He used to be a workaholic. With the insulin he did not have the energy he had in the past. R. 42. He participated in group therapy at Lurline Smith Mental Health Center ("Mental Health Center") in Mandeville. R. 40. He saw Dr. Lartigue, a psychiatrist, at LSU in Bogalusa. R. 41.

Kaul could not afford his medicine. R. 43. His sisters tried to help him, but they did not live in his community (Bush, Louisiana). R. 43. He went to the grocery store on his motorbike. R. 43. Although he used to be a good cook, he could not cook because he could not pay attention. R. 43-44.

The vocational expert classified Kaul's past employment as a stage handler as heavy skilled, and his prior position as a crane operator as medium skilled. R. 45. In response to the hypothetical question from counsel for Kaul, the vocational expert testified that Kaul would have difficulty maintaining employment. R. 46.

c.   **Medical Evidence**.

On November 30, 2009, Kaul was admitted for 9 days to the LSUHSC Bogalusa Medical Center ("Bogalusa Medical") through its emergency room because of seizures he experienced at home. He had a history of diabetes type II. The diagnosis was nonketotic hyperosmolar syndrome (a complication of diabetes mellitus with a high risk of complications including coma). Although the seizure was probably secondary to the hyperosmolar syndrome rather than withdrawal from alcohol, he was treated for alcohol withdrawal. R. 256. The physical examination indicated that he

had abdominal surgery secondary to a gunshot wound in the past.  R. 258.  A CT scan showed:  (1) no evidence of intracranial bleed or cerebral vascular accident (stroke); (2) moderate atrophic changes (brain atrophy) with symmetrical dilation of the ventricular system; and (3) mild periventricular deep white matter changes of chronic small vessel disease.  R. 264.  Kaul's sister reported that he had no history of any seizure disorders.  R. 260.

After his diabetes was well controlled, on December 9, 2009 he was discharged to go home. R. 256.  The discharge diagnosis was: nonketotic hyperosmolar syndrome; seizure not otherwise specified; alcohol dependence; Hepatitis; and thrombocytopenia (relative decrease of platelets).  R. 257.

On February 17, 2010, he returned to Bogalusa Medical for a follow-up.  It was noted that he was ambulatory and performed the activities of daily living independently.  He was smoking tobacco and drinking alcohol.  R. 300.  The physician, Dr. Glynn Hebert, provided diagnoses of diabetes, HTN and chronic Hepatitis C.  R. 299.  A diabetic eye exam was performed.  R. 294.

On April 6, 2010, he returned to Bogalusa Medical.  It was noted that he was ambulatory and performed the activities of daily living independently.  He was smoking tobacco and drinking alcohol.  He reported numbness and tingling in his fingers and toes.  R. 296.  He was seen by  Dr. Morteza Shamsnia.  R. 295.  Kaul's complaint of memory loss was noted.  An MRI was ordered. R. 295.

On April 13, 2010, Kaul was seen by Miljana Mandich, MD, an internist, for a consultative examination.  R. 283-87.  Kaul reported:  (1) heavy drinking through all of his adult life; (2) street drug use, including intravenous (heroin, cocaine and pain medications); (3) he quit alcohol and drugs in November 2009; (4) he was hospitalized in November 2009 for 9 nine days after a seizure; and

(5) there have been no further seizures.  His past medical history included:  (1) a cholcystectomy in the 1980's; (2) surgery to his left eye when he was child; (3) 1999 surgery to the abdomen following a gun shot wound; (4) hospitalization in the 1970's following a motorcycle accident; (5) a 2005 tractor accident; and (6) a neck injury in a 2009 auto accident.  He reported living alone in his mother's house.  R. 283-84.

The physical examination was completely unremarkable.  R. 287.  He was well-nourished.  He ambulated without difficulty.  The neurological examination was normal.  For example, the muscle bulk, tone and strength were preserved in all four extremities.  R. 286.  The mental status examination was normal.  R. 286.  Although he complained of poor memory since November 2009, he was found to be a good historian.  R. 286.

On April 14, 2010, Kaul returned to Bogalusa Medical.  It was noted that he was ambulatory and performed the activities of daily living independently.  He was smoking tobacco and drinking alcohol.  R. 302.  Dr. Glynn Hebert reviewed the lab results with him and noted his elevated blood pressure.  Kaul was set for a gastroenterology appointment.  R. 301.

On June 23, 2010, Kaul returned to Bogalusa Medical.  It was noted that he was ambulatory and performed the activities of daily living independently.  He was smoking tobacco and drinking alcohol. R. 303.  Dr. Hebert noted that Kaul did not have the GI Clinic appointment, so one was arranged for him.  He was scheduled to return to Dr. Hebert in three months.  R. 304.

On July 21, 2010, there was a normal electroencephalogram (EEG) at Bogalusa Medical. R. 311.  An August 5, 2010 x-ray found no metallic foreign body in or near the eye.  R. 309.

On September 1, 2010, there was a psychiatric clinic evaluation by Christopher Lartigue, M.D., a psychiatrist, at Bogalusa Medical.  Kaul came with his sister.  R. 289-92.

8

Dr. Lartigue described him as having severe thought disorganization and memory deficits. Symptoms of depression were reported even before the November 2009 seizure and coma. Since November 2009, he had experienced long and short term memory problems and apraxic (total or partial loss of ability to perform coordinated movements or manipulate objects) problems. He reported hospitalizations at DePaul and Charity for symptoms of depression. R. 289.

His father died in January 2010. His mother had dementia and lived with one of Kaul's sisters. He got by on food stamps and support from his mother. He reported that he had been arrested for burglaries which he did not commit. At the time of the evaluation, he reported no charges against him and he was not on probation. R. 290.

The mental status examination revealed: (1) a mood moderately depressed and anxious; (2) psychomotor activity was mildly retarded; (3) affect was appropriate to mood; (4) intelligence was low average or demented; (5) long term memory was inconsistent; (6) attention span was poor; (7) thought processes were very digressive; (8) persecutory anxieties; (9) some auditory and visual illusions; (10) fair insight; and (11) poor judgment. The diagnosis was major depression with psychotic features. R. 291 and 363. Dr. Lartigue described the polysubstance abuse in prolonged remission. R. 363. Kaul was continued on Prozac. Seroquel was started. He was to return in four weeks. R. 292.

On September 7, 2010, Kaul was seen at Bogalusa Medical for an appointment with Dr. Shamsnia in the neurology clinic. It was noted that he was ambulatory and he performed the activities of daily living independently. He was smoking tobacco and drinking alcohol. R. 298. He complained of memory loss. An MRI was ordered. R. 297.

9

A September 29, 2010 MRI of the brain revealed no evidence of acute ischemia, infarction or acute intracranial hemorrhage.  Mild atrophic change was identified.  R. 307-08.

On October 13, 2010, Kaul was seen at the gastroenterology clinic at Bogalusa Medical for a hepatitis check-up on a referral from Dr. Hebert.  It was noted that he was ambulatory and he performed the activities of daily living independently.  While he reported smoking tobacco, it was noted that he denied drinking alcohol.  R. 305-06.  He reported memory problems and depression.  The diagnosis included memory loss.  R. 306.

An October 27, 2010 ultrasound revealed a mildly coarse liver, normal kidneys, enlarged spleen, and unremarkable pancreas and urinary bladder.  R. 349.

On October 27, he was seen by Dr. Lartigue, who reported that he was focusing a little better, he was less anxious and not as depressed, and there were no hallucinations.  He was worried about the disability process.  The Prozac was increased.  There was no reference to the September 29, 2010 MRI.  R. 350.

The next day, October 28, 2010, Kaul went to the Positive Living Center in St. Bernard.  He reported that he needed case management help because he was having difficulty functioning.  R. 392.  He was referred to the Mental Health Center, where he was seen by John Strain, LPC.  R. 392-94.  He reported a history of drug use, hospitalizations for suicide attempts, and 11 years in jail in various segments for non-violent crimes.  Since Hurricane Katrina he had lived with his parents.  After his father died and his sister took in his mother, who suffered from dementia, he lived alone in his parents' house in Bush, Louisiana.  He had difficulty taking care of himself.  His family supported him with money.  R. 392.  He had been drug free for a year and a half.  R. 393.  He attended church 3 times a week for socialization.  R. 395-96.

10

On November 18, 2010, he attended therapy.  R. 391.

On December 8, 2010, Kaul was seen at the Mental Health Center.  He reported a lot of trouble managing on his own.  He requested a case worker to help him with day-to-day life.  R. 384.  He was seen by Beatrice Groene, M.D., a psychiatrist, who completed a psychiatric evaluation.  He was diagnosed with major depression with psychosis.  R. 384.  An evaluation was completed on December 9, 2010.  R. 383-390.  On December 16, 2010, Kaul returned to Dr. Lartigue and reported to him that he was being seen by Dr. Groene because he would receive more services and less expensive medication.  His sister did not come with him.  Dr. Lartigue arranged to send Kaul's records to Dr. Groene.  R. 348.

On December 21, 2010, Kaul returned to the neurology clinic at Bogalusa Medical for a follow-up on the results from the MRI.  He was ambulatory.  He performed the activities of daily living independently.  He denied using tobacco or alcohol.  R. 346.  He complained of memory loss.  Dr. Shamsnia ordered a polysomnogram (sleep test).  R. 347.

On January 8, 2011, Kaul was seen by a therapist (registered nurse) at the Mental Health Center.  The mental status findings included alert and orientated.  He denied suicide ideation or hallucinations.  R. 379.

On February 2, 2011, Kaul returned to the gastroenterology clinic at Bogalusa Medical.  R. 344.  He denied using drugs or alcohol.  He reported memory loss.  He was to follow-up with neurology.  R. 345.

On February 4, 2011, he was seen by the therapist at the Mental Health Center.  There was no change in the mental status findings from January 10, 2011.  R. 378.

11

On February 17, 2011, he was evaluated at the Advanced Sleep Center.  He was to avoid the supine position and consult with ENT for any upper airway lesions that could be treated surgically. R. 343.

On February 18, 2011, Kaul was seen by Dr. Hebert at Bogalusa Medical for a report on labs and the sleep study.  He was ambulatory.  He performed the activities of daily living independently. He admitted using tobacco but denied drinking alcohol.  R. 341.  He was to return on May 20, 2011. R. 342.

On March 3, 2011, he was seen by the therapist at the Mental Health Center.  There was no change in the  mental status findings from January 10 and February 15, 2011.  R. 377.

On May 17, 2011, Kaul was seen in the neurology clinic at Bogalusa Medical by Dr. Shamsnia.  R. 402.  He reported memory loss.  He was to return for the next available appointment. R. 403.

On May 20, 2011, Kaul was seen by Dr. Hebert.  He was ambulatory.  He performed the activities of daily living independently.  He admitted using tobacco but denied drinking alcohol.  R. 400.  An appointment was scheduled for August 24, 2011.  R. 401.

On June 29, 2011, there was no change in the mental status findings from January 10, 2011. R. 376.

On July 13, 2011, Kaul was seen at the Mental Health Center.  He reported that he was unable to cope.  R. 374.  The diagnosis was depression and dementia.  R. 375.

On January 10, 2012, Barbara Smith, M.D., completed a questionnaire provided by counsel for Kaul.  The diagnoses included major depression with psychotic features and dementia with evidence of cognitive impairment.  R. 443-45.

From January 16 to 21, 2012, Kaul was admitted to the St. Tammany Parish Hospital.  R. 404-412.  After he took insulin, he was confused and slow to respond.  He was not in acute distress. He was alert and oriented.  R. 404.  A chest x-ray did not reveal acute pulmonary process.  A CT scan for the head did not reveal acute intracranial process.  A CT scan of the abdomen revealed cirrhosis of the liver.  In the hospital he had no further hypoglycemia.  R. 405.

He was discharged in stable condition.  R. 406.

d.      **Plaintiff's Appeal.**

**Issue.**   Whether substantial evidence and relevant legal standards support the ALJ's determination that Kaul's mental impairment was not severe at step two of the sequential evaluation process?

Kaul contends that the ALJ erred at step two of the sequential evaluation in finding that his mental impairment was not severe.  He contends that:  (1) contrary to the ALJ's finding, there were objective symptoms supporting the diagnosis of dementia and major depression by a psychiatrist, Dr. Lartigue; (2) it was improper for the ALJ to rely on the results of the physical examination by Dr. Mandich, a consulting internist, for evidence concerning the finding of non-severity for the mental impairment; (3) a second treating psychiatrist, Dr. Groene, reached the same diagnosis as Dr. Lartigue; (4) the ALJ improperly selected evidence from Kaul's function report to demonstrate that he could engage in all activities of daily living; and (5) a third psychiatrist, Dr. Barbara Smith, agreed with Drs. Lartigue and Groene.

1.      Is Kaul's argument moot because the ALJ resolved the case at step five?

The Commissioner responds that the argument over the ALJ's finding at step two that Kaul's medically determinable mental impairment was not severe is moot.  At step two the ALJ found that Kaul had two severe impairments:  (1) diabetes mellitus; and (2) hypertension.  R. 16.  He found that

Kaul's hepatitis C and right rotator cuff tear were not severe impairments.  He also found Kaul's affective disorder was a non-severe mental impairment.  R. 16.  The ALJ continued to step three (Kaul did not have an impairment or combination of impairments that met the listing requirements [R. 19]) and step four (Kaul was unable to perform any past relevant work [R. 24]).  To reach step four the ALJ found that Kaul had the residual functional capacity to perform the full range of medium work.  R. 19-23.  At step five, the ALJ found that there were jobs in significant numbers in the national economy that Kaul could perform.

In Stone v. Heckler, 752 F.2d 1099 (5th Cir.1985), the ALJ found that the claimant's impairment was not severe and denied the claim at step two and did not go beyond it.  Id. at 1100.  The Fifth Circuit held:

> An impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

Id. at 1101.  The Fifth Circuit stated that it will assume that the ALJ and Appeals Council applied an incorrect standard to the severity standard unless the correct standard is set forth with reference to its opinion.  Id. at 1106.  In Chaparro v. Brown, 815 F.2d 1008 (5th Cir. 1987), the claimant argued that the Commissioner presumptively applied the wrong standard to determine severity because Stone v. Heckler was not cited.  The Fifth Circuit held that the claimant's argument was irrelevant because the case was not resolved at step two.  Instead, it was determined at step four (whether claimant could return to his past relevant work).  Id. at 1011.  Kaul's argument that the ALJ improperly determined that his medically determinable mental impairment was not severe is not relevant because the ALJ did not stop at step two.

14

2.      The activities of daily living.

Assuming arguendo that Kaul's argument concerning his mental impairment is not moot, the

issue is whether there is substantial evidence for the ALJ's finding that Kaul's affective disorder was

a non-severe mental impairment.  The standard for determining severity is found in Stone v. Heckler.

After reviewing the treatment records from Dr. Lartigue, Kaul's follow-up visits to the

Mental

Health Center, and Dr. Groene, the ALJ found:

> ...[o]nly mild limitations of the claimant's daily activities, mild limitations on his
> social functioning, mild limitations in his ability to maintain concentration,
> persistence, or pace, and no episodes of decompensation.

R. 17.  The ALJ cited evidence of:  (1) Kaul's daily activities, for example his ability to drive alone;

and (2) his ability to maintain concentration, persistence or pace; for example Kaul's report of a fair

ability to follow spoken instructions.

After his diabetes was well controlled and he was discharged on December 9, 2009 to go

home (R. 256), Kaul returned to Bogalusa Medical at least nine times from February 17, 2010 to

May 20, 2011, where it was noted that he performed the activities of daily living independently.  R.

296, 298, 300, 302, 303, 305, 341, 346 and 400.  Kaul testified that he lived alone (R. 43) and he

went to the grocery store on his motorbike (R. 43).  On October 28, 2010, Kaul reported to John

Strain, LPC at the Mental Health Center that he attended church 3 days per week and sought groups

for socialization.  R. 396.

The ALJ referred to the Adult Function Report completed by Kaul on October 31, 2010 and

his responses concerning his abilities.  R. 17 and 202-09.  In response to the question on how well

he followed spoken instructions, Kaul answered "Fair."  R. 207.

15

Kaul responds that the ALJ implies that he is more or less fully functional.  He urges that it was improper for the ALJ to mischaracterize his function report (R. 202-09) as supportive of non-severity contending that the ALJ engaged in a selective reading of the record leaving a false and misleading impression.  He argues that the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position.  Loza v. Apfel, 219 F.3d 378, 393-394 (5th Cir. 2000).  In the adult function report, Kaul indicated that his memory was defective and he could not complete tasks (R. 202); although he tried to plan for the day, stay focused and remember, he could use help (R. 203); he only prepared frozen meals; he had a hard time with procedures (R. 204); although he paid bills, he had difficulty with priorities; his concentration was off; he had good days and bad days (R. 206); and he could only sustain attention for two to five minutes (R. 207).

The Commissioner responds that:  (1) Kaul reported to Dr. Mandich that he had unrestricted ability to perform all activities of daily living, including driving (R. 284); (2) he reported to John Strain, LPC at the Mental Health Center that he attended church 3 days per week and sought groups for socialization (R. 379); (3) in February 2001, the Mental Health Center noted that he appeared to be able to function well (R. 378); (4) in June 2011, the notes reveal that Kaul injured his rib while working in a storage trailer (R. 376); and (5) in the function report, Kaul responded that he cared for pets, prepared meals daily, cared for his lawn, cleaned his home, performed laundry, shopped, and regularly attended church functions (R. 17, 203-05).  The Commissioner contends that the ALJ properly determined that Kaul's activities of daily living indicate that his alleged mental impairment was not severe.

16

As noted by the Commissioner, what Kaul contends is selective choosing of evidence is the resolution of conflicting evidence. There is substantial evidence to support the ALJ's finding regarding Kaul's ability to maintain the activities of daily living. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002).

3.      Additional evidence.

In finding that Kaul's mental impairment was not severe, the ALJ also cited evidence of: (1) a report from a nurse at the Mental Health Center that he appeared able to function well; (2) Dr. Groene's report that Kaul's attention and concentration were adequate for the purpose of the interview; and (3) the mental status examination performed by Dr. Mandich, the internist. R. 17-18. The record demonstrates the presence of the evidence cited by the ALJ.

On February 15, 2011, Kaul was seen the Mental Health Center by M. Cabler, R.N. The nurse noted:

> Client reports compliance with meds. He denies any side-effect and is sleeping well. He has been attending one on one peer support groups. Mr. Kaul expressed concern for his mother, who has recently been placed in hospice care due to her declining health status. She currently resides in a nursing home, but he is hoping that his sister will bring her back home for the remainder of her time. He continues to have memory problems, but appears to be able to function well. He attends church twice per week.

R. 378 (emphasis added).

On December 8, 2010, Dr. Groene completed a psychiatric evaluation at the Mental Health Center. In her report regarding the mental status examination, Dr. Groene recorded that:

> The thoughts he expresses are logical, coherent and goal directed without loose associations, obvious delusions or paranoia. His attention and concentration are adequate for the purpose of the interview. He does not appear to be responding to internal stimuli.

17

R. 385 (emphasis added).

Dr. Mandich's April 27, 2010 report of the examination (R. 283-87) contains the following for the mental status part of the examination:

> The personality estimate seems to be within normal limits.  The patient is oriented in four spheres and appears to be of average intelligence.  He is a good historian but repeatedly complains of poor memory since last November.  He is exhibiting normal cooperation, mood, behavior at the time of this exam.

R. 286.

4.  <u>Credibility</u>.

In finding only mild limitations, the ALJ gave little weight to Kaul's testimony regarding his depression and dementia and little weight to the third party statement provided by Kaul's sister.  R. 18.[2]  At step four, the ALJ determined that Kaul's statements concerning the intensity, persistence and limiting effects of his alleged symptoms were not credible to the extent they were inconsistent with a RFC to perform the full range of medium work.  R. 22.  These two findings are related.  The record presents substantial evidence in support of the ALJ's credibility determinations.  The ALJ based these findings on a number of factors.

a.  Kaul's ability to independently handle his personal care.

When Kaul completed the question relating to personal care in the adult function report, he indicated that he had no problem with personal care.  R. 203.  Dr. Groene described Kaul as casually dressed and groomed.  R. 385.  Dr. Lartigue described Kaul as a "[t]hin man in casual clothing with good personal hygiene and weather beaten appearance."  R. 290.

---

[2] Kaul's sister provided a statement dated October 31, 2010, Exhibit 5E, in which she states that Kaul does not comprehend what he is told and he doesn't follow through with tasks.

b.      Kaul did not seek mental health treatment until long after his alleged onset date.

The alleged onset date is November 30, 2009, when he was brought to the emergency room after a seizure.  R. 256.  He did not seek psychiatric treatment until 9 months later when he and his sister went to Dr. Lartigue.  R. 289.

c.      The medical evidence revealed significant improvement and no side effects.

On September 1, 2010, Dr. Lartigue assigned a Global Assessment Function ("GAF") of 35. R. 291.  Three months later, his condition had improved and Dr. Groene assigned a GAF of 55.  R. 385.  Dr. Lartigue also reported no discernible side effects from the medication.  R. 350.

d.      Kaul's outpatient care was medication management and minimal monthly therapy.

Two months after his initial evaluation by Dr. Lartigue (R. 289-292), Kaul returned to him on October 27, 2010 and his medication was adjusted (R. 350).  The next day, Kaul went to the Positive Living Center which referred him to the Mental Health Center.  R. 392.  He returned to the Mental Health Center on November 18, 2010, where he was seen by John Strain, LPC.  R. 391.  On December 8, 2010, he was evaluated by Dr. Groene.  R. 384-85.  Kaul returned to the Mental Health Center five times over the next eight months.  R. 374-79.

e.      The medical records have no evidence of an extended coma or anoxic brain damage.

The July 21, 2010 electroencephalogram was normal indicating an absence of epileptic activity. R. 311.  The November 30, 2009 CT Scan (R. 264) and the September 29, 2010 MRI (R. 307-08) did not reveal any evidence of an extended coma or anoxic brain damage.  These objective test results indicate that Kaul's November 30, 2009 condition was not the result of a seizure disorder or epilepsy.

f.      Kaul's depression was due to external factors - financial problems, his mother's illness and his need for disability benefits.

The Bogalusa Medical records referred to financial implications as a limitation or problem for Kaul in securing treatment.  R. 296.  He relied on food stamps and financial support from his mother.  R. 290.  His sister provided him with financial support.  R. 396.  Dr. Groene noted financial problems.  R. 385.  His father died in January of 2010.  His mother had dementia and was required to move in with his sister.  R. 384.  In January 2011, he reported that his mother had pneumonia and her dementia was becoming worse.  R. 379.  On February 4, 2011, he reported that his mother was on hospice care and was in a nursing home.  R. 378.  On July 13, 2011, it was noted that Kaul was obsessed with getting disability benefits.  R. 374.

g.      Kaul was not candid when completing job applications.

Kaul reported that he was laid off at several jobs because he did not report his prior criminal record.  R. 208.

h.      Kaul's criminal record.

The ALJ determined that this made his credibility highly suspect.  R. 23.

i.      Kaul was non-compliant with medication management on a least one occasion.

On July 13, 2011, the Mental Health Center noted that he failed to have his insulin prescription filled in a timely manner.  R. 374.

5.      <u>Drs. Lartigue and Groene</u>.

In finding that Kaul's mental impairment was not severe, the ALJ gave little weight to Dr. Lartigue's observation of mental limitations and the assessment of dementia by Drs. Lartigue and Groene.  R. 18.  Kaul challenges this finding.  Rec. doc. 15 (Memorandum at 7-11).

20

The ALJ noted that Dr. Lartigue's treatment in the form of medication management was limited to four office visits.  R. 18.  Dr. Lartigue initially saw Kaul for the evaluation on September 1, 2010 and Kaul returned to Dr. Lartigue on three occasions:  (1) September 29, 2010 (R. 360); (2) October 27, 2010 (R. 350); and (3) December 16, 2010 (R. 348).  On September 29, Kaul reported that he was feeling better.  On October 27, Dr. Lartigue described him as focusing a little better.  He was less anxious and depressed.  The Prozac was increased.  On December 16, Kaul reported that he was seeing Dr. Groene, who needed his records.

The ALJ commented that Dr. Lartigue's findings were not supported in the other treatment notes.  R. 18.  As noted in the preceding paragraph, Dr. Lartigue found improvement in Kaul and decreased symptoms on the three visits following the September 1, 2010 evaluation.

On September 1, 2010, the diagnosis from Dr. Lartigue included a GAF of 35.  R. 291.  On December 8, 2010, Dr. Groene assigned a GAF of 55 indicating improvement.  R. 385.

The treatment notes from the Mental Health Center reflect improvement in Kaul's condition.  On November 18, 2010, about 3 weeks before the evaluation by Dr. Groene, Kaul was described as exhibiting symptoms of confusion.  He appeared to be impaired cognitively.  R. 391. On January 8, 2011, about a month after Dr. Groene's evaluation, Kaul appeared alert and oriented.  He reported progress toward his treatment goals, he was compliant with his medication, he was sleeping well, he was going to church 3 days a week for socialization, and he was getting along a little better with his sister.  R. 379.  On February 4, the report was similar to the January 8 report with the additional comment that he appeared to be functioning well.  R. 378.  On March 3, 2011, the subjective portion was mixed.  Kaul was sleeping well, he continued to attend church, and he was trying to attend AA.  He reported being forgetful and having difficulty with concentration.  The mental status

21

examination, however, found that he was alert and oriented.  He denied suicidal ideations.  He did not have audio or visual hallucinations.  His thought process was logical.  R. 377.  On June 29, 2011, the results of the mental status examination were the same as those for March 3.  He was not sleeping well because of pain in his rib area following a fall in a storage trailer at home.  R. 376. On July 13, 2011, he was diagnosed with depression, dementia and polysubstance abuse.  R. 374-75.

In support of Dr. Lartigue's findings, Kaul cites:  (1) Dr. Groene's diagnosis of Major Depression with psychosis and dementia (R. 385); (2) Dr. Groene's assessment of a GAF of 55 (R. 385); (3) the July 13, 2011 report, in which he was observed as depressed with a weathered look, his thoughts were not logical, his insight was poor, and his recent to past memory was poor (R. 374); and (4) the July 13, 2011 diagnoses of dementia and depression with a GAF of 50 indicating a moderate to severe impairment of functioning (R. 375).

At most Kaul's response presents a conflict in the evidence.  Where such exists, it is for the ALJ to  resolve and not the Court.  Masterson, 309 F.3d at 272.

The ALJ reported that Dr. Lartigue's findings were not observed by Dr. Mandich, the consultative examiner.  R. 18.  Kaul responds that he was sent to Dr. Mandich, an internist, for a physical examination.  He was not sent for the purpose of a mental status examination.  He argues that it is unreasonable to consider Dr. Mandich's findings as a factor in deciding to accord little weight to Dr. Lartigue's findings.  The regulations, however, provide that, "[i]n determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(a)(2)(b).  The mental status examination portion of Dr. Mandich's report contained a relevant medical opinion on whether Kaul had a mental impairment and if so, whether it was severe.  Because of the regulations, it was

appropriate for the ALJ to consider the findings on Dr. Mandich's mental status examination for the weight to be accorded Dr. Lartigue's findings.

The ALJ noted that in making the assessment of dementia, Drs. Lartigue and Groene relied heavily on Kaul's subjective report of his symptoms.  The ALJ stated that there were good reasons to question the reliability of Kaul's subjective complaints and referred to his finding on Kaul's credibility.  R. 18 and 22.  There is substantial evidence to support the ALJ's finding regarding Kaul's credibility.  See *supra* at 18.

The CT scan and MRI revealed only mild atrophic changes and white matter changes commonly seen in patients who have microvascular and macrovascular risk factors such as a history of hypertension, diabetes and high cholesterol.  R. 18, 264 and 307-08.  Kaul's challenge to the ALJ's action is silent about the results of the CT scan and MRI.  Rec. doc. 15 (Memorandum at 7-11).  In their evaluations, Drs. Lartigue and Groene do not discuss or appear to take into account the CT scan and MRI.  The ALJ cited this, in deciding to accord little weight to the assessment of dementia.

The Commissioner notes that Drs. Lartigue and Groene did not take into account Kaul's history of substance abuse.  R. 18.  Kaul reported using cocaine, crack, opiates, methadone, heroin, barbiturates, Soma, benzodiazepines, mushrooms and acid.  His intravenous drug use included morphine, Demerol, heroin and cocaine.  R. 384 (Family History provided to Dr. Groene).  Dr. Lartigue's report refers to heroin and cocaine.  R. 289.  His diagnosis included polysubstance dependence in prolonged remission.  R. 291.  Dr. Groene's diagnosis included history of poly-drug abuse without reference to a period of remission.  R. 385.  Notwithstanding Kaul's extensive history of drug use, the psychiatric evaluations do not contain any mention or discussion of its effect on Kaul's cognitive functioning.

The ALJ found that Drs. Lartigue and Groene failed to consider Kaul's recent history of alcohol abuse.  He also found that Dr. Lartigue's description of Kaul's remission from drinking as prolonged was not supported by the record.  R. 18.

Kaul was seen at Bogalusa Medical on November 30, 2009 for the hospitalization after his seizure.  He was treated for alcohol withdrawal.  R. 256.  When he returned to Bogalusa Medical on February 17, 2010, he reported occasional alcohol use.  R. 300.  Except for June 23, 2010, Kaul reported alcohol use each time he returned to Bogalusa Medical before Dr. Lartigue's September 1, 2010 evaluation.[3]  R. 289.  When Kaul returned to Bogalusa Medical less than a week after the evaluation by Dr. Lartigue, he reported alcohol use.  R. 298.  On October 13, 2010, he denied drinking.  R. 305.  Dr. Lartigue saw Kaul on October 27, 2010 and included "polysubstance dependence in prolonged remission" in the diagnosis.  R. 350.  Thereafter when Kaul returned to Bogalusa Medical, he denied alcohol use.[4]

Dr. Lartigue's description of Kaul as in prolonged remission from drinking is based on the history reported by Kaul.  As discussed *supra* at 18, Kaul's credibility is questionable.  In addition the "prolonged remission" is contradicted by the Bogalusa Medical reports of Kaul's alcohol use before and after Dr. Lartigue's psychiatric evaluation.

There is substantial evidence to support the ALJ's decision to give little weight to Dr. Lartigue's observations of mental limitations and the assessment of dementia by Drs. Lartigue and Groene.

---

[3]  The medical records from Bogalusa Medical reveal:  that on February 17, 2010, he reported occasional alcohol use (R. 300); on April 6, 2010, he reported alcohol use (R. 296); on April 14, 2010, he reported alcohol use (R. 302); and on June 23, 2010, he reported no alcohol use (R. 303).

[4]  See December 21, 2010 (R. 346), February 2, 2011 (R. 345), February 18, 2011 (R. 341), and May 20, 2011 (R. 400).

6.    New evidence.

Kaul contends that new and material evidence submitted on appeal refutes the ALJ's findings at step two.  He describes Dr. Barbara Smith as an examining psychiatrist at the Mental Health Center, who answered a set of questions and provided diagnoses including Major Depression with psychotic features and dementia with a GAF of 35.  R. 443-444.  Dr. Smith's questionnaire responses indicate that Kaul has evidence of a severe cognitive impairment which results in an inability to sustain concentration sufficient to complete tasks in a timely manner (R. 444).  Dr. Smith, who was provided with Dr. Lartigue's records, agreed with his observations and noted that she also observed these traits.  R. 444.

The Commissioner responds that there is no evidence that Dr. Smith ever examined Kaul.  Her name does not appear in the treatment records.  The Court agrees that Dr. Smith merely recites the diagnoses by Dr. Lartigue as recounted by Dr. Groene.  Dr. Smith's questionnaire responses are duplicative of the assessments from Drs. Lartigue and Groene.  There is substantial evidence to support the ALJ's decision to give little weight to these assessments.

The Appeals Council admitted evidence of an inpatient hospitalization within three months of the ALJ's decision for complications with hepatitis, including hepatic encephalopathy, hepatic cirrhosis and acute metabolic encephalopathy.  R. 404.

The Commissioner responds that these records indicate that Kaul did not have dementia.  They reported that Kaul suffered an "acute change of mental status with hypoglycemia" and was "confused and slow to answer" prior to his admission in January 2011.  R. 404.  Dr. Lartigue reported similar symptoms, such as poor concentration and digressive, tangential thoughts.  R. 291.

The hospital records reveal that the symptoms were caused, not by dementia, but hypoglycemia attributable to Kaul's misuse of his diabetes medication.  R. 404.

Rather than erode the support for the ALJ's decision, the hospital records add to the ALJ's decision to discount the diagnoses of dementia because the psychiatrists did not take into account evidence indicating Kaul's symptoms may be attributable to diabetes.  R. 18.

Substantial evidence and the relevant legal standards support the ALJ's determination that Kaul's mental impairment was not severe at step two of the sequential evaluation process.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 17) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 15) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 8th day of October, 2013.

**SALLY SHUSHAN**
**United States Magistrate Judge**